**Donald E. BRINK et al.**

v.

**Leo DaLESIO et al.**

**Civ. No. Y–78–161.**

United States District Court,
D. Maryland.

Aug. 19, 1980.

Arthur L. Fox, Washington, D. C., and Paul Alan Levy, Washington, D. C., for plaintiffs.

Ransom J. Davis, Baltimore, Md., and Walter E. Dillon, Washington, D. C., for defendants.

JOSEPH H. YOUNG, District Judge.

This civil action by plaintiffs Donald E. Brink and John Eline on behalf of all members of their union and the various employee benefit trust funds it sponsored, against Leo DaLesio and Alfred Bell and two companies owned wholly by Bell, Fund Administration, Inc. and Alfred Bell, Inc., was heard by the Court in May, 1980. The plaintiffs are members of Local 311 of the Teamsters, which is in turn part of Joint Council 62. The parties have stipulated that both plaintiffs "were participants and beneficiaries of the Teamsters Local 311 Health and Welfare Fund when this suit was filed and became participants and beneficiaries of the Affiliated [Health and Welfare] Fund upon merger of the Funds." This merger took place after the instant suit was filed. Both plaintiffs are participants in, and beneficiaries of, the Local 311 Pension Fund. Neither plaintiff, however, has been either a participant or a beneficiary of the Allied Pension Fund.

Defendant DaLesio was the Secretary–Treasurer and principal executive officer of Local 311 from 1964 through 1977. From 1975 to 1977, he also served as President and principal executive officer of Joint Council 62. In 1963, DaLesio became a trustee of the Affiliated and Allied Funds, and assumed this position with respect to the Local 311 Pension and Welfare Funds upon their creation in 1967. He remained a trustee for the Funds until late 1977. Defendant Bell and his companies performed consulting, administrative, and insurance brokerage service for the Funds from 1963 to 1978.

Each of the defendants is charged with various breaches of fiduciary duties. The claims fall into three categories. The first set of claims is asserted solely against DaLesio and pertain to his receipt of allegedly excessive compensation and perquisites, and to his alleged breach of fiduciary duties in negotiating a lease of office space for the Local. The second category of allegations concerns transactions in which DaLesio received gratuities from individuals providing services to the Union and to the Funds, allegedly in violation of fiduciary obligations. The third part of the case pertains to the allegedly unreasonable commissions and fees paid to defendant Bell or his companies for his services.

To determine the validity of these claims, it is necessary to evaluate defendants' conduct in light of the prevailing legal standards. The Labor–Management Reporting and Disclosure Act of 1959 (LMRDA), also known as the Landrum–Griffin Act, 29 U.S.C. § 501 *et seq.* governs DaLesio's conduct in his capacity as a union officer. Title IV of the Employee Retirement Income Security Act (ERISA) 29 U.S.C. § 1101 *et seq.*, which took effect January 1, 1975, applies to the conduct of the defendants in their capacities as fiduciaries of the Funds. Other sources of duties are § 302 of the Taft–Hartley Act, 29 U.S.C. § 186, and the common law.

*DaLesio's Receipt of Allegedly Excessive Compensation and Perquisites.*

Before turning to the specific expenditures of Union funds challenged by the plaintiffs, it is useful to review the applicable legal standards. 29 U.S.C. § 501 provides, in relevant part, that:

[t]the officers . . . of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and . . . resolutions . . to refrain from dealing with such organization as an adverse party . . . and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

 The primary target of this legislation was the widespread embezzlement and misuse of union funds by officers. *Gabauer v. Woodcock*, 594 F.2d 662 (en banc) (8th Cir.1979); *McNamara v. Johnston*, 522 F.2d 1157 (7th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), and it has touched off a lively debate concerning the extent to which courts should defer to union officers' judgments concerning the propriety of various types of expenditures. *Compare, e. g., Sabolsky v. Budzanoski*, 457 F.2d 1245 (3d Cir.), *cert. denied*, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972) (strictly scrutinizing union's failure to disband locals with less than ten members) and *Farrington v. Benjamin*, 468 F.Supp. 343 (E.D.Mich.1979) (closely examining payment of fees to accountants, attorneys and union members as election assistants where such payments represented reasonable compensation but were not properly authorized) with *McNamara, supra*, 522 F.2d at 1164; *Gabauer, supra*, 594 F.2d at 668–70 (holding authorized, but illegal political contributions not to be actionable under

§ 501); and *Kahn v. Hotel Employees' International Union*, 469 F.Supp. 14 (N.D.Cal. 1977), *aff'd*, 597 F.2d 1317 (9th Cir.1979) (disclosure of conflicts of interest only required in cases where membership has a right to vote on challenged decision). In so ruling, the court in *Gabauer, supra*, 594 F.2d at 670 rejected the argument that "any expenditure unrelated to legitimate bargaining activities violates § 501." *See generally*, Comment, Determining Breach of Fiduciary Duty Under the Labor–Management Reporting and Disclosure Act: *Gabauer v. Woodcock*, 93 Harv.L.Rev. 608, 611 (1980); Leslie, Federal Courts and Union Fiduciaries, 76 Colum.L.Rev. 1314, 1326–28 (1976); Note, The Fiduciary Duty Under Section 501 of the LMRDA, 75 Colum.L. Rev. 1189, 1190–93 (1975); and Clark, The Fiduciary Duties of Union Officials Under Section 501 of the LMRDA, 52 Minn.L.Rev. 437 (1967). However, courts and commentators unanimously have maintained that stricter judicial scrutiny is appropriate when the expenditure confers a personal benefit on the union official, *see, e. g., Morrissey v. Curran*, 482 F.Supp. 31, 38 (S.D.N.Y.1979); and *Puma v. Brandenburg*, 324 F.Supp. 536, 544 (S.D.N.Y.1971); or where it confers no benefit on the union, *cf. United States v. Ladmer*, 429 F.Supp. 1231, 1240 (E.D.N.Y.1977). Leslie, *supra*, at 1323.

As noted by the court in *Morrissey, supra*, 482 F.Supp. at 39, "[t]he compensation of union officers falls into the hybrid class of expenditures that involve self–dealing . . but which also produce a union benefit, since no labor organization can function effectively without competent leadership." Therefore, judicial deference to the level of compensation set by the union is appropriate "except where the authorization was procured through fraud, mistake or duress or where the compensation so far exceeds the norm that fraud, mistake or duress can be inferred with some degree of assurance . . . ." *Id.* at 39–40.

 A number of factors are relevant to the Court's inquiry concerning the validity of an authorization. First, the autho-

rization must be obtained through the procedures specified in the Union constitution and bylaws. *McNamara, supra,* 522 F.2d at 1162; *Puma, supra,* 324 F.Supp. at 543. Second, the proposal must be presented in an understandable manner so that there is some assurance that consent was "knowingly and intelligently given." *Brink v. DaLesio,* 453 F.Supp. 272 (D.Md.1978); *see also Morrissey, supra,* 482 F.Supp. at 54. Voting procedures must be adequate to guarantee "the right of a meaningful vote." *Sertic v. Carpenters District Council,* 423 F.2d 515 (6th Cir.1970). In that case, the Sixth Circuit disapproved a ballot format in which previously defeated proposals were attached as riders to generally popular proposals to ensure their passage in a referendum. Finally, the timing of the authorization is critical. As indicated above, § 501 prohibits general exculpatory provisions. No problem is presented under this section if the union official obtains advance authorization for an expenditure. *Farrington, supra,* 468 F.Supp. 343. If the purported authorization is obtained subsequent to the actual expenditure, the Court must determine whether it is a legitimate ratification or an ineffective exculpatory provision.

A number of commentators have addressed themselves to this problem. Leslie, *supra,* at 1328, posits that "[r]esort to the common law of fiduciary relationships suggests two lines of analysis; that general exculpations are distinguishable from specific exculpations, and that exculpations are distinguishable from ratifications." He further suggests that a clause in the union constitution or bylaws purporting to insulate officers from liability in a class of cases would be a general exculpatory provision, and therefore void. A resolution passed relieving an officer of liability for a particular breach but not approving of the action would be a specific exculpation. Where a resolution both relieves the officer of liability and approves his conduct, the Court should consider it to be a ratification. One rationale for permitting specific exculpations and ratifications is that they occur "after the fiduciary breach has come to light." Also, they may be necessary when

the officer's "grant of authority was ambiguous." Finally, it might be argued that "the union should be permitted to decide that . . . the potential harm to the union from the adverse publicity of the suit outweighs the gain of a recovery against the officer." *Id.* at 1329. As conceded by Leslie, however, "[t]he contrary consideration is domination." *Id.* This consideration has led one commentator to suggest that "unions should not be allowed to excuse specific breaches by a union official of the duties imposed by section 501(a) after they have occurred, since powerful, even despotic union leaders might be able to manipulate their unions into *ex post facto* authorization of such conduct." Clark, *supra,* at 452. An intermediate approach is suggested in Note, *supra,* 75 Colum.L.Rev. at 1200. The author suggests that "[s]ince a union may have a significant interest in acknowledging the *status quo,* even one arrived at by a breach of trust, if there has been full disclosure of all the facts and if the ratification itself has not been tainted by fiduciary abuses, there should be no absolute denial of the power of the union to act in this manner. A court's analysis . . . should focus on the good faith of the original breach, the propriety and specificity of the ratification procedures and the consequences of disallowing a purported ratification."

Courts that have considered the validity of purported exculpations or ratifications generally have found them to be ineffective. *See, e. g., Morrissey v. Curran,* 423 F.2d 393 (2nd Cir.), *cert. denied sub nom. Segal v. Morrissey,* 400 U.S. 826, 91 S.Ct. 52, 27 L.Ed.2d 56 (1970); and *Johnson v. Nelson,* 325 F.2d 646 (8th Cir.1963). In so holding, however, these courts did not specify in what circumstances it would be appropriate to give effect to such an *ex post facto* authorization. In neither case, however, could the unauthorized conduct be characterized as a good faith mistake untainted by personal pecuniary or political motivation. In cases where these characteristics are present, judicial validation of specific exculpations or ratifications appears to be appropriate.

As mentioned above, a finding that an expenditure was authorized does not necessarily immunize an officer from liability. The next step is to determine whether the expenditure "violates the provisions of the . . . Act." *Sabolsky, supra,* 457 F.2d 1245; *see also Gabauer, supra,* 594 F.2d at 670. Since the focus of the Act is on the misappropriation of union funds for personal gain, the defendant charged with such misappropriation must show that the transaction was "fair and reasonable." *Brink, supra,* 453 F.Supp. at 278. This requirement is consistent with the general rule that the burden is on those in a fiduciary position to justify actions not comporting with fiduciary standards. *Blankenship v. Boyle,* 329 F.Supp. 1089 (D.D.C.1971).

### The Severance Fund

With these considerations in mind, the Court will now turn its attention to the merits of the various individual claims under the LMRDA. One of the most significant allegations concerns the severance fund established by Local 311 for the benefit of defendant DaLesio. The plaintiffs claim that the expenditure was not properly authorized under the union constitution and bylaws, that invalid procedures were used, and that in any case the severance fund represents unreasonable compensation and is therefore violative of the Act.

To assess these contentions, it is necessary to review the events leading up to the creation of the severance fund. Ralph Watson, a principal witness for the plaintiffs, testified that DaLesio first mentioned the concept of a severance fund to him in 1961 or 1962. In 1961, the Ironworkers local which DaLesio served as Secretary–Treasurer switched affiliations and joined the Teamsters organization as Local 480. When Local 480 merged with Local 311 in 1962, DaLesio was a business agent but was not initially on the Executive Board. Watson testified that the purpose of the severance fund was financial insurance for DaLesio in case he lost his position with the Union. DaLesio denied having this conversation with Watson. He also tried to impeach Watson's testimony by showing that Watson had initially been his protege and had become alienated from him when he lost this favored status. Although the Court finds that this change in the nature of the relationship between DaLesio and Watson did take place, it also finds Watson's testimony credible. First, this conclusion is supported by the fact that DaLesio's local was undergoing reorganization, thus rendering DaLesio's position less secure. Second, Watson testified that he is no longer a member of Local 311, has no personal interest in the outcome of this case, bears no grudges, and was not coached regarding his testimony.

Most important, however, is the fact that within several years of becoming Secretary–Treasurer, DaLesio in fact took steps to have the severance fund established. The first step in this process was the amendment of the Local's bylaws to permit remuneration in this form. Article XIV, § 1 of the 1960 bylaws states that "[t]he compensation of any full time officers and employees shall be as authorized by the Executive Board." Section 2 of this article limits compensation of any member holding more than one office so that he can receive only compensation for the highest paying position he holds. The 1964 bylaws, on the other hand, concentrate greater authority in the hands of the Secretary–Treasurer and expand the range of benefits for which he and other union personnel are eligible. More specifically, Section 9(a) makes the Secretary–Treasurer position a full–time one. Section 9(b) grants the Secretary–Treasurer authority to supervise all union officers and employees and to fix the salaries for union employees, and to hire and fire business agents. Section 9(f) grants him sole authority to disburse funds. Section 15(d) contains the new provisions specifically authorizing the Executive Board to provide for retirement benefits and other fringe benefits to union officers. This section also authorizes the Secretary–Treasurer to set benefits for appointive personnel. Finally, § 15(c) provides for the purchase of automobiles for officers.

The 1964 bylaws grant the Secretary–Treasurer greater authority and benefits than are provided for in the model bylaws provided by the International Union. For example, § 13(2) of the model bylaws gives authority to set salaries to the Executive Board rather than to the Secretary–Treasurer. These model bylaws also do not classify the Secretary–Treasurer position as full–time. In addition, the model bylaws give the President and the Secretary–Treasurer joint authority with respect to disbursement of funds.

At trial, DaLesio attempted to minimize his involvement in the amendment of the bylaws. He pointed out that he was Vice-President in 1964 when the changes were instituted. In addition, he stated that the changes were effected because the International issued a new set of bylaws in 1963. This account, however, is not credible. Cosimo Abato, an attorney with the firm that represents Local 311, testified that he had been urging the Local to amend the bylaws for some time and that it was only as a result of DaLesio's initiative that such revision was accomplished. Abato drafted a set of bylaws using the model ones submitted by the International as a starting point. He then submitted them to DaLesio with instructions as to the approval process. Abato also testified that he made no significant substantive changes in the model bylaws. Therefore, the inference that must be drawn is that DaLesio was responsible for making these substantive changes. The Court also finds that the fact that DaLesio was not appointed to the Secretary–Treasurer position until two months after the bylaws were revised does not compel a contrary conclusion. At trial, DaLesio stated that his predecessor's departure was not an anticipated event. At his deposition, however, he testified that Paul Brandt, his predecessor, was in his sixties, had a bad back, and walked with a cane. In addition, the testimony established that in the months after the merger, DaLesio, who was a business agent but not a member of the Executive Board, took the initiative in taking measures to remedy Local 311's fiscal woes. He was rewarded for his efforts when his predecessor in the position of Vice–President was asked to resign so that DaLesio could take his place. In light of these facts, it is apparent not only that DaLesio anticipated Brandt's resignation, but also that he anticipated being selected to succeed him.

■ The existence of these political machinations would not in and of itself justify a finding that the severance fund was improper. Subsequent events, however, do compel this conclusion at least with respect to the periodic increases to the fund. First, there is a substantial question concerning whether the new bylaws were properly approved by the membership. The minutes reflect that the procedures specified in Article XXXI of the 1960 bylaws for amendment of the bylaws were followed. The proposed bylaws were initially presented to the membership, then referred to the Executive Board, and finally approved by a two thirds vote of the membership at the next monthly meeting. What disturbs the Court, however is the explanation for the bylaw changes apparently offered by DaLesio. When he first proposed the amendments, DaLesio explained that the 1960 bylaws were in conflict with the International Constitution and were therefore null and void and that the International had sent the Locals model bylaws. At the next monthly meeting, the minutes reflect that DaLesio said the bylaws "were taken from the model" set provided by the International. The proposed bylaws were read aloud at both meetings, according to the minutes. However, there is no indication that the substantial departures from the model bylaws were disclosed or explained. Given DaLesio's incipient personal interest in these provisions, this failure was critical. It certainly violates the spirit, if not the letter of § 501's admonitions against self–dealing as well as its policy in favor of disclosure. The Court therefore has some doubts about the validity of the membership's approval of the bylaw provisions which later provided authority for the establishment of the severance fund. If this were an isolated incidence of apparent failure to disclose, it might be

argued that the minutes were incomplete, or that the omission of an explanation was the result of innocent mistake. An examination of the form in which information was presented to the membership while DaLesio was Secretary–Treasurer, particularly with respect to the severance fund, indicates that such self–serving omissions were the rule rather than the exception.

DaLesio also tried to minimize his role in the establishment of the severance fund by portraying Chick Twitchin as the moving force. Twitchin, now deceased, served as President of Local 311. Several witnesses who were on the Executive Board in 1966 when the severance fund was created testified that it was Twitchin who presented the proposal. Cosimo Abato, however, testified that both Twitchin and DaLesio came to his office in early 1966 to seek assistance in setting up such a fund. One of Abato's partners at the time, Thomas Bracken, researched the proper procedures for obtaining authorization. The advice given was to submit a resolution to the membership authorizing the Executive Board to set up the severance fund. The final plan would then be submitted to the membership for approval. Both Abato and a number of witnesses who were on the Executive Board at the time testified that the rationale for the fund was to guarantee DaLesio's income in case of retirement or election defeat. This testimony corroborates Watson's account of the earlier conversation he had with DaLesio in which these considerations were also discussed. It is significant that Watson was not a member of the Executive Board at this time and therefore was not privy to these discussions. In light of this fact it is also significant that when Watson was considering resigning from his position as business agent in 1969, DaLesio presented the severance fund as an example of a possible benefit of union employment. At that time, DaLesio told Watson how he had gone about having the fund established. He told Watson that he had Twitchin sponsor the proposal. Watson also testified that in the latter years of his tenure as President, Twitchin had been retained on the payroll despite his lack of contribution to the union.

At his deposition, DaLesio conceded that Twitchin was not very active in union affairs in his later years. Thus, it is reasonable to infer that Twitchin was indebted to DaLesio and therefore was willing to sponsor the severance fund.

The minutes do reflect that the procedures outlined by Abato were followed in obtaining initial membership approval for the fund and that the proposed amount of weekly contributions, $200, was disclosed. All of the Executive Board members who testified, including Watson, indicated that their opinion was that DaLesio did an excellent job rebuilding Local 311 and that he deserved this compensation. However, the Court has grave doubts concerning whether subsequent increases in the level of contributions to the severance fund were authorized under circumstances showing informed consent.

The record shows that the level of contributions was increased $100 per week in April, 1970 and January, 1972. There were $50 per week increases in March, 1973 and again in January, 1974. On each occasion, the minutes of the Executive Board meeting show that the motion voted upon only reflected the amount of the increase and did not indicate the total level of contributions. A number of other factors support the Court's conclusion that the officers were unaware of the magnitude of the severance fund. First, at trial, the trustees who testified generally did not know the total level of contributions, nor the frequency with which they were made. Second, an examination of the Local's monthly financial statements prepared under DaLesio's supervision by Mary Finch, the secretary and bookkeeper, and read at Executive Board and membership meetings indicates that the severance fund contributions were not listed separately but were lumped together with pension contributions. Given that the severance fund contributions represented about 90% of the combined total, the Court finds this format misleading. Similarly, the financial disclosure forms filed with the Department of Labor did not list the severance fund contributions sepa-

rately until 1974 when the Department conducted an audit and required that this be done. DaLesio was the officer who took responsibility for complying with the Department of Labor's instructions. He made no change, however, in the format of the monthly financial statements as a result of this audit.

The Court's conclusion that although the initial level of contributions to the severance fund was properly authorized, the increases were not, is bolstered by an examination of the reasonableness of the amounts contributed. First, taking the severance fund into account, DaLesio was the highest paid union officer in the Baltimore area. Second, although Local 311's financial condition did improve steadily during the early years of DaLesio's tenure, this trend was reversed by 1974. The inference that the high level of contributions to the severance fund contributed to this decline is borne out by a comparison of the amount in the severance fund to the Local's net assets. By 1977, there was approximately $250,000 in the severance fund. In contrast, the Local's net assets amounted to slightly more than $100,000. In the Court's opinion, DaLesio's "compensation so far exceeds the norm that fraud, mistake or duress can be inferred with some degree of assurance . . . ." *Morrissey, supra,* 482 F.Supp. at 40. In sum, despite its reservations concerning the manner in which the bylaws were amended to provide for additional forms of compensation and for greater centralization of responsibility in the hands of the Secretary-Treasurer, the Court will permit DaLesio to retain that portion of the severance fund that would have accrued had the weekly level of contributions remained at $200. In so ruling, however, a few comments are necessary concerning the complicity of DaLesio's fellow Executive Board members as well as of the Local's counsel. While it is true that DaLesio made an effort to present information in such an unusable form as to preclude a finding of disclosure, the fact remains that his fellow officers never objected to this format. Also, counsel apparently never advised DaLesio or his fellow officers that the amount of compensation

had to be reasonable under the LMRDA, nor that forthright disclosure was mandated. As will be discussed frequently in this opinion, the improprieties of the defendants in this action were exacerbated by the obliviousness and indifference to fiduciary duties shown by the Local's officers, the Fund trustees, and the professionals retained by them. It does takes two to tango.

*DaLesio's Simultaneous Use of an Automobile Furnished By Local 311 and Receipt of an Automobile Allowance from Joint Council 62.*

■ As mentioned above, a provision authorizing the purchase of an automobile for union officers was added when the bylaws were amended. Pursuant to this provision, Local 311 purchased what the plaintiffs have referred to as "luxuriously appointed" Cadillacs for DaLesio's use. In addition, the Union paid all of the expenses incurred in connection with these automobiles. While DaLesio enjoyed the use of the automobile provided by the Local, he received a monthly automobile allowance of $100 from Joint Council 62 from the time he assumed the position of President in early 1975 until the allowance was redesignated in January, 1977. The plaintiffs claim that the Cadillacs were both improperly authorized and unreasonable expenditures, and that DaLesio's receipt of the automobile allowance was also violative of the LMRDA.

In alleging that the purchase of the Cadillacs was unreasonable, plaintiffs do not appear to contend that the purchase of any car would have been unreasonable. There was abundant testimony that DaLesio's position involved frequent and irregular travel for the discharge of his organizing and negotiating duties. Moreover, these factors are recognized explicitly in the bylaw provision authorizing the purchase. Also, the bylaws authorize private use of the automobiles "as partial compensation for such additional responsibilities." Thus, the plaintiffs are requesting this Court to override the Union's choice of a particular automobile model. While the selection of a more moderately priced automobile might have been preferable, the Court finds that this is the

type of decision upon which reasonable men could disagree and which absent any showing of improper authorization, merit judicial deference.

▉ The Court must turn its attention then to the authorization issue. The evidence established that Cadillacs were purchased in 1970, 1972, and 1975. In 1970, a Buick owned by the Union was traded in for the Cadillac. On subsequent occasions, the Cadillacs were traded in for newer models. The record reflects that in 1970 and 1972, the purchases of the automobiles were approved by the Executive Board and that the Executive Board minutes were read regularly at the next membership meeting. The plaintiffs challenge this method of obtaining membership approval. First, they point out that members were never notified when a major issue or expenditure was to be considered at a meeting. Also, they emphasize the low level of membership turnout at the monthly meetings. Finally, they established that the meeting time was inconvenient for a segment of the membership. While the Court agrees that the approval method utilized by Local 311 did not represent the epitome of representative democracy, the fact remains that these were the established procedures, and that they neither precluded membership participation nor were immune from the amendment process. Again, judicial deference to the Union's choice of procedures is appropriate absent any showing that the procedures were utilized to stifle dissent. In this case, there was some evidence that a group of dissatisfied members attempted to mount an opposition slate in the early 1970's, but that this effort was deterred by veiled threats of force. While such tactics are certainly reprehensible, they are not a necessary byproduct of the existing procedures and therefore do not justify invalidating those procedures.

▉ The plaintiffs also challenge the timing of the authorization of the automobile purchased in 1970. DaLesio purchased the automobile before obtaining Executive Board or membership approval. Executive Board approval however was obtained at the evening meeting on the same day as the purchase and the check was not issued until the next day. Membership approval was not obtained until almost a week later. The Court frowns upon such highhandedness; however, it concludes that the subsequent Executive Board and membership action constitutes a ratification, and not an exculpation under the analysis outlined earlier. The *ex post facto* authorization endorsed rather than excused DaLesio's conduct, and was specific rather than general.

▉ DaLesio's use of a union automobile, however, renders inappropriate his receipt of an automobile allowance from Joint Council 62. At trial, it was established that the automobile allowance was set up for the benefit of an individual from Salisbury, Maryland who had served previously as President and who had substantial traveling expenses. The allowance was not discontinued when DaLesio's immediate predecessor took office, even though he resided in the Baltimore area and therefore did not have to commute long distances. This individual served a brief tenure as President and was replaced by DaLesio in 1975. DaLesio testified that although he signed vouchers clearly designating the $100 as an automobile allowance, he did not notice this designation until early 1977. Rather, he stated that he was under the impression that all of the $300 he received on a monthly basis from Local 311 was salary. The Court, however, finds that this explanation is not credible. First, the redesignation of the automobile allowance was done at DaLesio's initiative shortly after the grand jury subpoenaed Local 311's records. Second, the explanation is not consistent with the obvious attention to detail shown by DaLesio when such attention was in his self-interest. Third, the automobile allowance was not listed as income on DaLesio's tax returns. Fourth, other Joint Council 62 officers testified that they were not aware of the fact that DaLesio had the use of an automobile provided by Local 311 and that all of the related expenses were paid by the Local. Although Fred Killen, an officer of Joint Council 62, testified that

he considered the allowance to be a form of compensation, that fact does not alter the Court's conclusion that DaLesio concealed information that reasonably could be deemed material to his receipt of the automobile allowance. Even were this Court to find, however, that DaLesio was receiving an automobile allowance in these circumstances with the fully informed consent of his fellow officers, it would be compelled to disallow it. As explained earlier, the underlying policy of the LMRDA is to prevent embezzlement of union funds. Central to this purpose is the requirement that expenditures which profit officers personally be disclosed fully. Misdesignation of salary as an automobile allowance is inconsistent with this requirement. Union members desiring to scrutinize the performance of their officers must have access to complete and correct information. Therefore, the Court will grant the plaintiffs the relief requested and will order DaLesio to return to Joint Council 62 the sum of $2,150 received as an automobile allowance.

*Expense Accounts and Travel Allowances.*

■ Initially, plaintiffs challenge DaLesio's failure to remit to the Union and to the Funds unexpended portions of his travel allowances. At trial, however, testimony established that the universal practice until ERISA took effect was to retain such funds and report them as income. This practice was engaged in pursuant to counsel's advice. Since approximately 1977, the practice has been to remit the unexpended portions of such allowances. The latter practice is clearly preferable. Given DaLesio's reasonable reliance on the advice of counsel, however, this Court must find that his previous failure to remit the unexpended portions of such travel allowances did not constitute a breach of his fiduciary duty.

■ Considerable testimony was introduced to attempt to prove plaintiffs' allegations that DaLesio failed to secure adequate records to substantiate his claims for reimbursement of expenses incurred while on union business. The record is clear that the procedures followed, or not followed, can

give rise to abuses. Occasional discrepancies do not, in and of themselves, justify the conclusion that DaLesio was embezzeling union funds as stated under the expense account allegations.

*Miscellaneous Perquisites.*

Initially plaintiffs challenge the provision of the tennis club membership to DaLesio. At trial, however, the evidence established that the Executive Board had passed a resolution authorizing the purchase of a country club membership for DaLesio because he needed rest and relaxation. In light of this evidence of authorization, the plaintiffs have abandoned this claim.

■ They still seek, however, the restitution of the cost of Baltimore Colts season football tickets. The parties stipulated that the union bought a block of season tickets for the years 1971 through 1977. The total cost of these tickets was $3354.70. At trial, DaLesio introduced no evidence that the purchase of these tickets was authorized or disclosed to the membership. In addition, his assertion that the expense was union-related was contradicted by the evidence. Although there were occasions on which DaLesio invited other officers to join him, the evidence established that the disposition of these tickets was solely within DaLesio's discretion. For these reasons, the Court will grant the plaintiffs the relief they request.

*The Acquisition of Equipment from Local 311 Employers.*

Under 29 U.S.C. § 186, it is illegal for a union officer to receive money or anything of value from an employer except as specifically provided. Section 186(c)(3) creates an exception "with respect to the . . . purchase of an article or commodity at the prevailing market price in the regular course of business." At trial, it was established that DaLesio bought some equipment from two Local 311 employers, Joseph J. Hock, Inc. and C. J. Langenfelder & Son, Inc. which was then contributed to a corporation in which Ralph DaLesio, the defendant's son, had a 50% interest.

Plaintiffs contend that these transactions did not come within the statutorily defined exemptions. In particular, they point to the fact that DaLesio only paid book value, and that the equipment was assigned a value much higher than the sale price on the books of the corporation. Unfortunately, it was difficult to reconstruct the transaction with Hock. Jay Johnson, however, an officer with Langenfelder, testified that the terms of the transaction were not influenced by DaLesio's position. Therefore, there is insufficient evidence from which this Court could infer that the sale of the equipment did not take place at arms length and on terms acceptable to the seller.

### The Harford Road Offices.

Another transaction at issue in this lawsuit is the decision of Local 311 in 1974 to move its offices to a building on Harford Road owned by defendant Bell. Plaintiffs argue that DaLesio breached his duty "not to act on behalf of an adverse party in a transaction" without the Local's knowledge and consent. *Restatement (Second) of Agency* § 391. In particular, the plaintiffs allege that DaLesio failed to select quarters reasonably suited to the Local's needs and that he failed to negotiate reasonable rental terms for the quarters that were chosen. Although the evidence pertaining to this claim is not unambiguous, it does appear that the Harford Road offices were not well suited to the Local's needs, that a substantial outlay of union funds was required to render them suitable, and that the terms of the rental agreement were not fair and reasonable.

In examining the plaintiffs' contentions, it must be kept in mind that 1974 was also the year in which Bell bought a condominium in Ocean City, Maryland which he permitted DaLesio to live in without charge. The propriety of that transaction will be discussed later. In this context, however, that transaction is significant because "[t]he receipt of anything of a substantial nature from an adverse party to a transaction is evidence that the agent is acting on behalf of such person and is sufficient, without more, to sustain a judgment against the agent." *Restatement (Second) of Agency* § 391, comment e. The receipt of such substantial gratuities is particularly troublesome in this situation; all of the union officers who testified stated that they did not know that the condominium used by DaLesio was owned by Bell. Thus, it is not possible to draw an inference of informed consent to DaLesio's possible representation of interests adverse to those of the union. Rather, the burden was on DaLesio to establish that the challenged transaction was fair and reasonable.

At trial, DaLesio and Finch testified that it was necessary to secure alternate quarters on very short notice. This testimony, however, is inconsistent with the minutes of the Executive Board meeting in February, 1974, more than five months before the move took place, which establish that the search for new offices had commenced by then. Despite having such advance notice of the need to find new offices, DaLesio only looked at two or three locations. When the time for moving drew near, and a suitable property had not been located, Bell was contacted. Bell testified that the individuals contacting him were DaLesio, Finch, and Cremen. This testimony, however, is not entirely credible. Finch testified that she was on vacation during the weeks preceding the move and had no active part in locating new office space. Also, only DaLesio who had recently persuaded Bell to purchase the Ocean City condominium, would have had reason to know that Bell might be willing to purchase a building in which Local 311 could rent space.

At trial, Bell attempted to establish that he purchased the building at Harford Road as a favor to the union. He stated that DaLesio, who was a trustee on the 311 Funds, was an important client and therefore "in the driver's seat." He supported this view of the situation by pointing to the fact that he lost money on the property on a cash flow basis. He conceded, however, that tax considerations were not taken into

account in such a computation. He also stated that even though he would have preferred a long term lease, he had to settle for a short term lease because DaLesio preferred such terms.

The fact that Bell's investment in the Harford Road property may have been done as a favor to the union and may not have proved to be profitable to Bell does not demonstrate that the transaction was in fact reasonable. The evidence established that the Local spent $8847 on renovations to make the new offices suitable. These permanent improvements were made despite the fact that the rental arrangement was not pursuant to a long term lease. In addition, some of the expenditures were attributable to the construction of a meeting hall. This hall, however, was not large enough to handle all meetings, and the union was forced to rent a meeting hall on several occasions. There was testimony, however, that in other respects the new offices were an improvement over the union's former quarters, because they were more spacious and because the presence of the Fund administrator's offices in the same building was a convenience to members.

The question, however, was whether the new offices represented a significant enough improvement to justify an increase in rental costs from $390 per month to $944 per month. DaLesio attempted to justify the transaction by stating that before negotiating the lease with Bell, he investigated the prevailing rental rates and found that $6 per square foot was the going rate. Matthew Sysak, the property manager for Alfred M. Bell and Associates, testified that he surveyed the area and found that rental rates varied between $4.50 and $7.00 per square foot. Bell testified that the same rate was charged to Alfred Bell, Inc. which also became a tenant and to the tenant who remained after Bell bought the building. At first glance, then, it would appear that the rental rate was reasonable. The testimony on behalf of the defendants, however, does not stand up under closer scrutiny. There was evidence that Bell was unable to rent substantial portions of the building, even when rates as low as $4.75 per square foot were offered. Moreover, in 1978 when the Local decided to sever all ties with Bell, new quarters of comparable size were found within a matter of weeks at a yearly rental rate of $4.75 per square foot. The defendants did not introduce any evidence showing that these new quarters were in any way inferior to those at Harford Road. In fact, it appears from the lease that improvements were paid for by the lessor rather than the lessee. In light of this fact, it is necessary to add in the cost of the renovations at the Harford Road location before comparing the rentals. If these costs are spread out over the 43 month tenancy, the monthly rental is increased $205.74 to $1149.74. Thus, the effective charge per square foot was $7.31. Although it could be argued that the costs of the improvements should be amortized over a longer period to reflect the expected duration of the tenancy when DaLesio negotiated the rental terms rather than the actual duration of the tenancy, several factors militate against such a conclusion. First, it was DaLesio and not Bell who was responsible for selecting a month to month tenancy. Second, DaLesio testified that he preferred this arrangement because it afforded greater flexibility. Third, it was the union rather than Bell who terminated the rental arrangement, albeit in response to some rather extraordinary circumstances. In sum, there was apparently no expectation that the tenancy would continue for any particular period, and therefore it is reasonable to utilize the actual duration of the tenancy in calculating the rental costs.

Measured under an objective standard of reasonableness, it is apparent that DaLesio breached his fiduciary duty in negotiating for the rental of office space at the Harford Road location. Plaintiffs have requested relief in the form of reimbursement by DaLesio to the union of $19,338.82, the difference between the costs incurred at Harford Road and the rental that would have been paid had quarters been secured on the terms equivalent to those prevailing at the new offices. The defendants introduced no

persuasive evidence showing that offices could not have been secured in 1974 at more modest rental rates. Regrettably, the plaintiffs, who bear the burden of proving the elements of their claim introduced no evidence of rental rates prevailing in 1974 and the Court will not presume what their evidence might have been. Accordingly, on this claim, plaintiffs are entitled to damages in the amount of $1.

*DaLesio's Receipt of Gratuities from Individuals Providing Service to Local 311 or the Funds.*

The next portion of the opinion will discuss DaLesio's receipt of gratuities from John Mitchell, the accountant for Local 311 whose firm also provided services to the Funds, and from Alfred Bell, whose companies provided services to the Funds. To the extent that the union's interests are involved, DaLesio's conduct is governed by the fiduciary duty imposed by the LMRDA which was discussed earlier. To the extent that the Funds are involved, the common law applies to conduct occurring before January 1, 1975, while ERISA provides the legal standard after that date. More specifically, 29 U.S.C. § 1104 obligates a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan; . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . ." There is no dispute that DaLesio falls within the definition of fiduciary provided in 29 U.S.C. § 1002(21)(A). Section 1106 supplements the general standard by providing that certain transactions are prohibited per se. Relevant to this discussion is § 1106(b)(3) which bars a fiduciary from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

The proper interpretation of this provision has been the subject of controversy in the instant case. An examination of the legislative history indicates that it was designed to prevent kickbacks. *See* H.R.Conf.Rep. No. 93–1280, 1974 U.S.Code Cong. & Admin.News, pp. 4639, 5038, 5089. *See also* Little and Thrailkill, Fiduciaries Under ERISA: A Narrow Path to Tread, 30 Vand.L.Rev. 1, 25 (1977). The controversy in this case under both ERISA and the common law centers around the issue whether the plaintiffs need show that there was a *quid pro quo* for the gratuities or that harm to the union or the Funds resulted. There is neither case law nor regulations governing the proper interpretation of § 1106(b)(3); nevertheless, an examination of decisions construing other provisions of ERISA demonstrates that plaintiffs need not show that the receipt of gratuities actually influenced DaLesio's discharge of his fiduciary duties. Initially, it should be noted that ERISA is a "comprehensive remedial statute designed to protect the interests of participants in employee benefit plans" and that a broad construction of the statute is therefore appropriate. *Marshall v. Kelly*, 465 F.Supp. 341, 349 (W.D.Okl.1978). Therefore, "the question of whether ERISA has been violated does not depend on whether any harm results from the transaction. Congress was concerned in ERISA to prevent transactions which offered a high potential for loss of plan assets or for insider abuse . . . ." *Id.* at 354. A similar approach was taken by the court in *Gilliam v. Edwards*, 492 F.Supp. 1255 (D.N.J.1980) in construing § 1106(b)(1) barring a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." The court noted that a defendant who engages in a prohibited transaction does not escape liability by showing "the absence of bad faith, or . . . the presence of a fair and reasonable transaction . . . ." *Id.* A strict construction of the prohibited transaction provisions is also justified by administrative convenience. In addition, the court noted that it is psychologically unrealistic to expect a trustee to

ignore his personal interests when they are potentially at odds with his fiduciary obligations. *Id.*

The defendant has argued that the statutory language dictates the opposite result. The Court is in agreement that the provision, standing alone, is not unambiguous. It would appear to require the plaintiff to show that the defendant received consideration in a transaction in which the plan assets were involved. In other words, it might be argued that the language suggests that a showing of an actual effect on the plan is required. Such an interpretation, however, would render the provisions superfluous in light of § 1106(b)(1) and (2) which clearly prohibit self-dealing with plan assets and representation of parties with adverse interests in transactions involving plan assets. In addition, the defendant's suggested interpretation is inconsistent with the common law rule that a *quid pro quo* need not be shown, *see, e.g., United States v. Bush*, 522 F.2d 641, 648 (7th Cir. 1975); *McGinnis v. Rogers*, 262 Md. 710, 732, 279 A.2d 459 (1971). Rather, "a trustee . . . is not permitted to place himself in such position that the interest of the beneficiary and his own personal interest do or may conflict; and the question of whether or not such a position has resulted in a benefit or loss to the beneficiary is not to be inquired into." *Mangels v. Tippett*, 167 Md. 290, 300, 173 A. 191 (1934). In light of these considerations, then, the Court has determined that § 1106(b)(3) is violated when a fiduciary receives gratuities from any party dealing with the Fund.

*The Provision of Free Tax Services.*

John Mitchell, the accountant for Local 311 for the past ten years, testified that he provided tax services to DaLesio and other officers without charge from 1970 to 1977. This was apparently common practice. Mitchell's firm, Burch and Mitchell, was also the accounting firm retained by the employee benefit funds. His firm ceased providing these services to union and company officers as a result of criticism of such practices by the Internal Revenue Service. He presently charges DaLesio $150 for preparation of his income tax return. Mitchell stated that this fee was the fair market value of the services provided. He also stated that the services provided to DaLesio over the years were worth approximately $500.

█ DaLesio attempted to justify his receipt of such services by pointing out that it was a common practice. He also attempted to show that the Local did not bear the costs of these services, even indirectly. This attempt failed, however, in the face of Mitchell's admission that the time spent on officers' tax returns was counted when charges for services provided to the Local were calculated. Moreover, this Court finds that there are other policy reasons for finding the practice, common though it might have been, to be violative of DaLesio's fiduciary duties to the Union and the Funds. First, the only rationale for such provision of free services by a firm to its client's officers is that it is seeking to maintain the goodwill of those individuals responsible for selecting professionals to provide services and for agreeing to the terms of compensation for such services. On the other hand, individuals in positions of trust have the duty to engage in comparative shopping to ensure that the Local or Fund is receiving the best services for the money. Also, fiduciaries are responsible for overseeing the work of those retained to ensure that the Local or Fund is receiving its money's worth. Receipt of gratuities, regardless of whether the cost is actually passed on to the Union or Fund, necessarily compromises the fiduciary's objectivity. Finally, there are no countervailing factors militating in favor of such practices. In sum, the Court finds that the receipt of gratuities in the form of tax preparation services violated DaLesio's duties under the LMRDA, the common law, and ERISA without regard to whether the costs attributable to those services were passed on to the Union or the Funds and without regard to whether there was any demonstrable effect on DaLesio's discretion concerning the selection and retention of accountants to perform services for those entities. Even were it necessary for the

plaintiffs to show such an impact, the Court would find liability. As mentioned earlier, Mitchell's testimony indicated that the time spent on DaLesio's tax returns was taken into account in establishing the fee to be charged.

This testimony raises questions concerning the extent to which the Funds should share in the $500 recovery to be ordered by the Court. On one hand, the Union bore the easily ascertainable costs of the breach. On the other hand, DaLesio also breached his duty to the Funds. The Court sees no rationale for restricting DaLesio's liability to the Funds to the years after the enactment of ERISA. His conduct did not comport with common law fiduciary standards in the prior years. Another consideration is the fact that these plaintiffs do not have standing to challenge conduct pertaining to the Allied Pension Fund and the Affiliated Health and Welfare Fund as will be discussed later in this opinion. In light of these factors, it appears that the most equitable remedy would be to order DaLesio to remit the entire amount to the Union. This remedy would both prevent unjust enrichment and would ensure that the Union was fully compensated for its losses.

*The Ocean City Condominium.*

Another receipt of gratuities challenged by the plaintiffs involves a condominium in Ocean City which Bell bought in 1974 at DaLesio's suggestion and which DaLesio lived in during the summers of 1974 to 1977, and used sporadically during the rest of the year, without paying rent. DaLesio, at trial, gave his version of this transaction. He testified that he had rented the condominium in 1973 and that when he found out it was for sale, he approached Bell and suggested that Bell buy the condominium for investment purposes. DaLesio stated that he did not buy the condominium himself, not as a result of financial factors, but because he was unsure of whether his family would like it. DaLesio testified that the asking price for the condominium was $78,000 but that he was able to negotiate a good deal because the seller was under financial pressure. This testimony is subject to question in light of the fact that the unit was appraised at only $79,500 three and a half years later. In any case, Bell paid $60,500 for the condominium. DaLesio supposedly guaranteed Bell's investment by agreeing to buy it at a specified price when Bell wanted to sell.

At trial, the defendants attempted to portray the transaction as an exchange for value. DaLesio testified that he bought furnishings including rugs and patio furniture. He also stated that he had air conditioning and a stone patio installed. He estimated that he spent $12,000 to $15,000 on these items. Ralph DaLesio testified that he purchased lamps and other small items for the condominium. DaLesio, however, was unable to produce any records substantiating his purchases. He stated that he paid cash for these items and that the store where he purchased the items is no longer in business.

Bell's account of the transaction corroborates some of DaLesio's testimony; in other respects, however, it is inconsistent. Bell also attempted to portray the transaction as an exchange for value. He testified that DaLesio served the useful purpose of deterring vandals during the summer months. Presumably a tenant who paid rent would have provided this service as well. He stated that he bought the condominium with the intention of holding it for six months but that he did not sell it at the expiration of that period because the real estate market was weak. It is at this point that the defendants' stories diverge. If Bell really intended to sell the property after only six months, it is unlikely that DaLesio would have purchased furnishings and made substantial improvements. Moreover, this account is not consistent with DaLesio's statement that he told Bell he would buy the condominium at a guaranteed price in the event Bell decided to sell and was unable to get a better offer. Both Bell and Sysak testified that it was not unusual for Bell to purchase properties which would remain vacant. They admitted, however,

that these properties were leased on an occasional basis and were used for entertaining friends and clients. In the face of Bell's stated intention of selling the condominium after six months, DaLesio's statement that the furnishings and improvements were necessary to make the condominium look presentable to potential buyers is incredible. The defendants' contention that the transaction was for fair consideration is undercut further by the fact that Bell paid all of the expenses incurred as a result of the DaLesio's use of the condominium. More specifically, he paid the taxes, some of the repair bills, condominium fees, insurance, all utilities except long-distance telephone charges, and the monthly cable television fee. In 1975 alone, these costs amounted to $9664. In the same year, Bell spent $4721 on furnishings for the condominium. This fact is also inconsistent with DaLesio's contention that he paid value for the use of the condominium and with Bell's contention that he bought the property solely for investment purposes.

Several other facts render the defendants' stories completely untenable. First, if the transaction was an exchange for value, there would have been no need to conceal it. Yet, at trial, it became apparent that the transaction had been concealed from everyone who might be interested. All of the trustees on the Funds testified that they were unaware of the fact that Bell owned the condominium. Ralph DaLesio stated that although he was under the impression that his father did not own the condominium, he was not aware of the fact that Bell owned it. The president of the owners' association in the group of condominiums in which the unit was located stated that he was under the impression that DaLesio was the owner and that Bell was his accountant. The Court's conclusion that the transaction was not legitimate is also supported by the fact that Bell sold the condominium to DaLesio in July, 1977, shortly after the grand jury began investigating their relationship. At that time, the defendants, who had never kept meticulous records documenting their expenses attributable to the condominium, obtained an appraisal of $79,500.

Because no broker was involved, an amount equivalent to the expected broker's fee was deducted, and the selling price was $74,000. The defendants' explanations for the timing of this sale are totally unbelievable. Bell stated that the time was ripe from an economic point of view. From DaLesio's perspective, however, the sale was apparently not at an opportune time. He had to sell another property and obtain money from his mother-in-law in order to finance the purchase. Finally, it is significant to note that the defendants had a similarly objectionable arrangement with respect to suites in Baltimore hotels and apartment buildings. Again, DaLesio was able to negotiate a reasonable rental rate for Bell who paid for the suites. It was DaLesio, however, who had a key and used the suites for his personal purposes. The defendants attempted to justify this arrangement by stating that the suites provided an office for Bell in Baltimore. The suites, however, were not outfitted for business purposes. In addition, the defendants' contention that trustee subcommittees met in the suites was undercut by the testimony of various of the trustees that they did not know about the suites or that they had been there on rare occasions for other purposes. DaLesio's ignorance of and indifference to his fiduciary obligations is most apparent in the proffered explanation of why he was able to negotiate low rental rates at the hotels. He testified that he was able to accomplish this by pointing out that a lot of union–related business would be generated thereby. This amounts to the use of union assets for the individual defendants' benefit.

From the evidence detailed above, it is apparent that DaLesio breached his fiduciary duty by accepting the benefits offered by Bell in the form of rent–free use of the Ocean City condominium. As discussed earlier, liability is not predicated upon a showing that the receipt of gratuities actually influenced DaLesio's conduct as a fiduciary. As the later segments of the opinion will show, however, DaLesio's conduct as a Fund trustee did not comport with fiduciary standards, and such an influ-

ence therefore can be inferred. In fashioning relief, the Court is faced with three difficult problems. First, the plaintiffs submitted little evidence concerning the rental rates for comparable housing in Ocean City during the time period involved. Second, the Court must decide whether any amounts spent by DaLesio for permanent improvements should be deducted from the damages awarded. Third, as the Court has determined that plaintiffs only have standing with respect to the 311 Health and Welfare and Pension Funds, it must decide whether to award only a pro rata share of the damages.

With respect to ascertaining the amount of damages, there was testimony that in 1974, a unit identical to Bell's was rented out at $500 per week during the summer months. While the Court is certain that rental values went up during the years in question and that the use of the condominium during the rest of the year was worth some ascertainable amount, the fact remains that the plaintiffs introduced insufficient evidence for the Court to estimate these values. Therefore, damages will be limited to the rental value for the three and a half summers DaLesio used the condominium, with the assumption that the imputed rent was $500 per week for ten weeks each summer, or a total of $17,500.

■ The next issue requiring resolution is whether the amounts DaLesio spent on permanent improvements such as air conditioning and the construction of a patio should be deducted from this figure. The *Restatement (Second) of Agency*, § 403, Comment c (1958), indicates that expenditures attributable to creating a profit in breach of a fiduciary duty are not deductible. There is no indication in this case, however, that DaLesio's use of the condominium was in any way conditioned on such expenditures. Given the lack of clear evidence concerning the amounts expended by DaLesio for these items, as well as the fact that the rental value is almost certainly understated and that no relief is being awarded for the daily expenditures incurred by DaLesio for which Bell paid, it does not

seem appropriate to take the costs of the permanent improvements into account in determining the relief to be awarded.

■ The remaining question is whether plaintiffs are entitled to the return of the entire $17,500 in light of their lack of standing to represent the interests of the Allied and Affiliated Funds. There does not appear to be any way to apportion the relief on the basis of harm to the particular Funds involved. Although DaLesio definitely failed to review the reasonableness of the amount of compensation paid to Bell for his services, the extent to which this failure is attributable to the receipt of gratuities such as use of the condominium is not clear. The fairest way to apportion the damages is therefore to divide them up equally among the Funds. As the plaintiffs in this lawsuit represent the interests of only two of the Funds, the Court will order relief on this claim in the amount of $8,750. Half of this sum is to go to the Local 311 Pension Fund, while the other half must be awarded to the Affiliated Health and Welfare Fund as the 311 Health and Welfare Fund merged into this larger fund after this lawsuit was initiated. To the extent possible under the terms of that merger, the recovery should be applied to benefit those participants and beneficiaries in the Affiliated Fund who were previously associated with the 311 Fund.

*Claims Arising Out of the Administration of the 311 Funds.*

The second portion of this opinion will address the claims arising out of the administration of the Funds by Alfred Bell. Plaintiffs suggest that Bell and DaLesio are jointly liable for the alleged breaches. Generally, the plaintiffs challenge the reasonableness of the remuneration received by Bell in connection with his services for the Funds. In particular, the plaintiffs challenge his allegedly undisclosed receipt of commissions and fees from the insurers· in light of his compensation arrangement with the Funds. The claims against DaLesio arise out of his alleged failure to either remedy this situation once he had knowl-

edge of it or to comply with fiduciary standards in reviewing the reasonableness of the arrangement. The import of plaintiffs' claims is that DaLesio breached his fiduciary duties as a result, in part, of the receipt of gratuities that was the subject of discussion earlier in this opinion.

Before proceeding to a discussion of the merits of these claims, several legal issues require resolution. First, the Court must determine whether the plaintiffs have standing to raise claims pertaining to the management of all of the Funds or only to those Funds with respect to which they are participants or beneficiaries. The next problem requiring discussion is whether Bell falls within the definition of "fiduciary" under ERISA and the common law or whether he was entitled to deal at arms length with the Funds. The final issue to be dealt with is the legal standard applicable given the Court's determination with regard to Bell's status.

*Standing of the Plaintiffs to Raise Claims Pertaining to the Management of Funds with which the Plaintiffs Are Not Associated as Participants or Beneficiaries.*

As indicated earlier in the opinion, the parties are in agreement that the plaintiffs were participants and beneficiaries of the Local 311 Health and Welfare Fund as well as the 311 Pension Fund when this suit was brought. At that time, however, neither plaintiff had any association with the Affiliated Health and Welfare Fund or with the Allied Pension Fund. Under ERISA, standing to bring such suits is limited to the Secretary of Labor, participants, beneficiaries, and fiduciaries. 29 U.S.C. § 1132(a). In general, courts have interpreted this provision strictly. For example, in *Blackmar v. Lichtenstein*, 603 F.2d 1306, 1310 (8th Cir. 1979), the court held that a former trustee lacked standing to challenge his replacement. In *Francis v. United Technologies Corp.*, 458 F.Supp. 84, 85 (N.D.Cal.1978), the court decided that a beneficiary's spouse lacked standing in a suit brought to secure her community property interest in her husband's retirement plan upon the dissolution of their marriage. Similarly, the court in

*Kerbow v. Kerbow*, 421 F.Supp. 1253, 1259 (N.D.Tex.1976), held that a spouse who was entitled to a portion of her husband's benefits under a divorce decree was not a beneficiary within the meaning of the statute and therefore lacked standing. Other potential parties denied standing under ERISA include an employer seeking restitution of contributions made on behalf of ineligible individuals, *Wong v. Bacon*, 445 F.Supp. 1177, 1183 (N.D.Cal.1977), a bank seeking to recover damages for losses suffered as a result of mismanagement of trust funds, *Hibernia Bank v. International Brotherhood of Teamsters*, 411 F.Supp. 478, 489–90 (N.D. Cal.1976), and a judgment creditor of a pension beneficiary seeking to garnish benefits, *National Bank v. Local 553 Pension Fund*, 463 F.Supp. 636, 638 (E.D.N.Y.1978).

■ In response, plaintiffs have posited a number of arguments in favor of standing. First, they argue that when the Local 311 Funds were created in 1967, they inherited both a segment of the group served by the Affiliated and Allied Funds, and the pattern of administration set up by the trustees of those Funds in conjunction with Bell. They also point out that after this lawsuit was initiated, the 311 Health and Welfare Fund merged back into the Affiliated Fund so that any relief awarded would inure to the benefit of the larger Fund. In essence, they argue that the claims of the two sets of Funds are inseparable. From the point of view of judicial economy, the Court agrees that it would have been preferable to litigate the claims of all of the Funds in one proceeding. Because the standing issue was not adequately briefed prior to trial, evidence concerning the Affiliated and Allied Funds was admitted. Nevertheless, no participant or beneficiary of these Funds sought to join this lawsuit; in fact, one of the original plaintiffs was associated with these Funds but withdrew from the litigation. In light of Congress' clear limitation on the classes of potential plaintiffs, as well as the plaintiffs' inability to demonstrate that the fiduciaries, beneficiaries, and participants of the Allied and Affiliated Funds are unable to vindicate

their rights, the Court feels constrained to rule that the plaintiffs do not have standing under ERISA to litigate the claims pertaining to the Allied and Affiliated Funds.

■ In the alternative, plaintiffs contend that because courts have implied causes of action under the LMRDA and Taft–Hartley for breaches of duty in the administration of pension and welfare funds, they have standing to challenge DaLesio's conduct while he was a Union official, without regard to which Fund was involved. Some courts faced with evidence of such breaches have relied on the provision in 29 U.S.C. § 186(c)(5) exempting from the statutory prohibition against payments from employers to union employees or officials contributions "to a trust fund . . . for the sole and exclusive benefit" of employees and their families. Section 186(e) grants "[t]he district courts . . . jurisdiction . . . to restrain violations of this section . . . ." Most courts considering these provisions, however, have been reluctant to imply a cause of action in favor of union members or trust fund beneficiaries except in the case of structural defects, such as an imbalance in the number of employer and employee representatives serving as trustees. *See, e. g., Knauss v. Gorman*, 583 F.2d 82, 85 (3d Cir. 1978); and *Lugo v. Employees Retirement Fund of Illumination Products Industry*, 529 F.2d 251 (2d Cir.), *cert. denied*, 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976). One court even went so far as to hold that a district court could grant injunctive relief but not damages under this provision. *Mobile Mechanical Contractors Association v. Carlough*, 566 F.2d 1213, 1219 (5th Cir. 1977). In addition, several courts have expressed doubts concerning the propriety of implying a cause of action under this section in favor of union members or trust fund beneficiaries in light of the passage of ERISA. *See, e. g., Knauss v. Gorman*, 433 F.Supp. 1040, 1044 (W.D.Pa.1977), *aff'd*, 583 F.2d 82 (3d Cir. 1978); and *Lugo, supra*, 529 F.2d at 255. In light of the specific statutory remedies provided in ERISA for violations of fiduciary standards in the administration of employee benefit funds, this Court is inclined to adopt the rationale of those cases restricting the application of § 186 to structural defect problems arguably not covered by ERISA.

■ The alternative source of a duty to plaintiffs is § 501. In *Hood v. Journeymen Barbers International Union*, 454 F.2d 1347, 1351 (7th Cir. 1972), decided well before the passage of ERISA, the court applied the fiduciary standard of § 501 to the "union-appointed members of a pension fund committee." In so holding, the court noted that the fiduciary principles codified in the LMRDA applied most directly in the pension and welfare fund context. *Id.* at 1354. However, such an application may be inappropriate. As the Second Circuit pointed out in *Morrissey v. Curran*, 483 F.2d 480, 484 (2d Cir. 1973), *cert. denied*, 414 U.S. 1128, 94 S.Ct. 865, 38 L.Ed.2d 752 (1974), "[t]he language of the section is clearly aimed at union officers, not trustees; nor can a trust be equated with 'a labor organization'. . . . The section was aimed at stopping the pilfering of union funds by union officials, not at the conduct of trustees acting in their capacity as fiduciaries." *Cf. Miniard v. Lewis*, 387 F.2d 864, at 865 n.5 (D.C. Cir. 1967), *cert. denied*, 393 U.S. 873, 89 S.Ct. 166, 21 L.Ed.2d 144 (1968). "Even though the fund here resulted from bargaining between the employers and the union, . . . the traditional duty owed by a union to its members is not applicable. Rather, the trustees' duties are those of fiduciaries because *as trustees* they perform a separate function and do not act as representatives of either the employers or the union." Moreover, application of § 501 results in the anomalous outcome that employee trustees are subject to a duty that is not applicable to the employer trustees. *Hood, supra*, 454 F.2d at 1354; *Tucker v. Shaw*, 308 F.Supp. 1, 7 (E.D.N.Y.1970). Finally, it has been suggested that the passage of ERISA obviated the need for federal courts to strain to imply a cause of action in favor of employee benefit fund participants and beneficiaries. Note, The Fiduciary Duty Under Section 501 of the LMRDA, 75 Colum.L.Rev. at 1212. While the Court recognizes that there may be

**1374**

occasions on which "a union member who is neither a participant nor beneficiary in the fund . . . wishes to challenge officials who misuse such funds in a way detrimental to the union as a whole and not just to the fund alone," *id.*, in which case implication of a cause of action under § 501 may be appropriate, the Court is convinced that the instant challenge to the propriety of the administrator's fees does not qualify for such treatment.

■ The remaining issue is whether the plaintiffs have standing, with respect to the Allied and Affiliated Funds, to raise claims arising before the passage of ERISA, even if they lack standing under ERISA to challenge the defendants' conduct after 1975. Resolution of this issue requires reference to state law. According to the *Restatement of Trusts (Second)* § 200 (1959), "[n]o one except a beneficiary or one suing on his behalf can maintain a suit against the trustee to enforce the trust or to enjoin or obtain redress for a breach of trust." In addition, "[a] person who incidentally benefits from the performance of the trust, but who is not a beneficiary of the trust, cannot maintain a suit to enforce the trust." *Id.* at § 200, Comment c. Maryland follows these rules in determining standing to enforce a trust. *Tarbert v. Rollins*, 130 Md. 413, 427, 100 A. 637 (1917). Although the plaintiffs may benefit incidentally from relief accorded to the Allied and Affiliated Funds, the fact remains that no contributions were made by employers on their behalf to these Funds before this suit was instituted. Therefore, they do not fall within the category of intended beneficiaries and lack standing to sue on these claims.

*Bell's Status as a Fiduciary.*

Defendant Bell contends that he was entitled to enter into arms length transactions with the Funds and that his conduct should not be judged under fiduciary standards. The plaintiffs, on the other hand, contend that Bell was a fiduciary with respect to the Funds under both ERISA and the common law.

■ In ERISA, Congress took a functional approach towards defining who would be treated as a fiduciary. 29 U.S.C. § 1002(21)(A) provides that "a person is a fiduciary . . . to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." At trial, Bell attempted to portray his role as purely ministerial. He testified, for example, that he did not regularly submit bids from insurance carriers, but only did so at the trustees request. Also, Bell stated that he did not have discretionary authority over investment of the Funds moneys because he merely followed the trustees' directions in determining which banks offered the highest interest rates on certificates of deposit. His testimony, however, was contradicted by that of the other witnesses. All of the trustees and fund counsel indicated they relied heavily on Bell's advice in a number of respects. In their view, it was Bell's responsibility to obtain the best possible insurance coverage at the most reasonable cost. The testimony was uncontradicted that Bell was solely responsible for formulating the specifications when bids were solicited. In addition, when optometric and dental services were added, Bell made the initial decision concerning whether bids were to be solicited. Bell also decided which carriers would receive solicitations. Once bids were received, Bell analyzed them and presented his analysis to the trustees. The evidence established that the trustees relied heavily on his advice concerning the amount of funds necessary to be maintained in a checking account. Even more significant, however, is the fact that on the rare occasions that the reasonableness of Bell's compensation was discussed, Bell advised the trustees concerning the

additional work that was required as the Funds expanded. Bell utilized this allegedly expanded workload to justify the increases in his compensation which resulted when employer contributions increased.

The Court's conclusion that Bell both exercised discretionary authority concerning the management of the Funds and rendered investment advice for a fee within the meaning of the statute is confirmed by an examination of the legislative history, as well as by scholarly and judicial interpretation. The Conference Report, *supra,* 1974 U.S.Code Cong. & Admin.News at 5103 indicates that "[t]he term 'fiduciary' . . . includes persons to whom 'discretionary' duties have been delegated by named fiduciaries. While the ordinary functions of consultants and advisers to employee benefit plans . . . may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisers may because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition." Relying on this history, Little and Thrailkill, *supra,* 30 Vand.L.Rev. at 4, suggest that "insurance salesmen who recommend the purchase of certain types of insurance and receive a commission on the sale of such insurance" may come within the statutory definition of fiduciary. In addition, the functions outlined above which were performed by Bell for the Funds do not fall within the category of tasks labelled ministerial in 29 C.F.R. § 2509.75-8, D-2. Finally, in explaining the need for an exemption from the prohibited transaction provisions in § 1106 for brokers receiving commissions from insurance companies and other individuals involved in the purchase of annuity or insurance contracts for plans, the Department of Labor noted that "[s]uch persons, because of their activities with respect to employee benefit plans, may be considered fiduciaries. . . ." Fed.Reg. 32395 (1977).

Most courts have taken a broad view in deciding whether a particular service provider should be considered a fiduciary under ERISA. In *Eaves v. Penn,* 587 F.2d 453 (10th Cir. 1978), for example, the court held that a potential buyer of a company who recommended that plan assets be used to finance indirectly his purchase was a fiduciary under the statute. More on point are the cases holding plan administrators and consultants who effectively controlled or guided the plans' management to be fiduciaries. *See, e. g., Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 635 (W.D.Wis. 1979); *Marshall v. Carroll,* 289 B.P.R. D-7 at D-10 (N.D.Cal., April 18, 1980); and *Eaton v. D'Amato,* 291 B.P.R. D-11 (D.D.C. May 1, 1980). As the court noted in *Eaton, supra,* at D-12, "[a]pplying a restrictive judicial gloss to the term 'fiduciary' itself would, in effect, enable trustees to transfer important responsibilities to a largely immunized 'administrative' entity. A clear congressional desire to expand the scope of fiduciary standards of conduct should not be so undermined." In the instant case, it is apparent that responsibility for important decisions pertaining to the scope of insurance coverage and the selection of carriers were delegated to Bell. In order to afford plan participants and beneficiaries the protection that Congress intended, insurance consultants such as Bell must be held to fiduciary standards.

This result is consistent with the agency relationship implied at common law between the insured and the insurance broker. First, it should be noted that "[w]hether a person is a broker or an agent is determined not by what he is called but by what he does." *Medical Mutual Liability Insurance Society v. Mutual Fire, Marine and Inland Insurance Co.,* 37 Md.App. 706, 714, 379 A.2d 739, 743 (1977). Under the applicable Maryland statute, an agency relationship is implicit in the definition of the term "broker" to be "a person who for compensation in any manner solicits, procures or negotiates insurance contracts . . . on behalf of insureds or prospective insureds . . . and not on behalf of an insurer or

agent." Md.Ann.Code Art. 48A, § 166(c). This definition comports with the common law rule that the broker is the agent of the insured, regardless of whether he is paid by the insured or the insurer and regardless of whether he solicited the insured or was solicited by him. *Reserve Insurance Co. v. Duckett*, 240 Md. 591, 601, 214 A.2d 754 (1965). *Cf. American Casualty Co. v. Ricas*, 179 Md. 627, 631, 22 A.2d 484 (1941).

*The Fiduciary Obligations of Bell under ERISA and the Common Law.*

■■■■■ As mentioned above, 29 U.S.C. § 1106 supplements the general fiduciary standard specified in § 1104 by providing that certain transactions are per se prohibited. These prohibited transaction rules are necessary because fiduciaries cannot negotiate the best terms for the beneficiaries in conflict-of-interest situations. *Cutaiar v. Marshall*, 590 F.2d 523, 530 (3d Cir. 1979). Section 1108 authorizes the Secretary of Labor to grant exemptions which are "administratively feasible, . . . in the interests of the plan and of its participants and beneficiaries, and . . . protective of the rights of participants and beneficiaries of such plan." Pursuant to this authority, the Secretary granted an exemption for individuals such as insurance brokers who customarily receive compensation from parties with interest adverse to those of the plan. The exemption applies to "[t]he receipt, directly or indirectly, by an insurance agent or broker or a pension consultant of a sales commission from an insurance company in connection with the purchase, with plan assets, of an insurance or annuity contract." 44 Fed.Reg. at 1428. Such a transaction, however, is exempt only if certain conditions are satisfied. First, under § IV(a), it must be "effected by the insurance agent or broker . . . in the ordinary course of its business as such a person." More importantly, § IV(b) requires that it be "on terms at least as favorable to the plan as an arm's–length transaction with an unrelated party would be." Moreover, § IV(c) provides that "[t]he combined total of all fees, commissions and other consideration received by the insurance agent or broker . . . [be] not in excess of

'reasonable compensation.'" Other duties may be implied from these specific provisions. In particular, the trustees of the Funds are obligated under § 1104 to ensure that they are administered "solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits . . . and defraying reasonable expenses . . ." Thus, the trustees have an obligation to ensure that insurance brokers or consultants providing services to the Funds receive only reasonable compensation and otherwise comply with the requirements of the exemption. In order for them to perform these tasks, full disclosure of material information concerning the services provided and the associated costs is required. In other words, under ERISA, Bell had a duty to disclose the amount of compensation he received from the insurer as well as an obligation to ensure that that amount was reasonable.

■■■■■ With respect to the transactions occurring before the passage of ERISA, it is clear that under the general common law principles pertaining to disclosure, Bell had an analogous duty to disclose the amount of commissions he received from the insurance carriers. *See generally Restatement of Agency (Second)*, §§ 381, 391 (1958); *cf. McGinnis v. Rogers*, 262 Md. 710, 279 A.2d 459 (1971). In a case strikingly parallel to the instant one, the court held that an automobile dealer who required his customer to obtain life insurance as a condition to obtaining financing had a duty as a broker under the common law to divulge the amount of compensation he was receiving from the insurer as well as a duty to assist the insured in obtaining insurance at the most reasonable rates. *Browder v. Hanley Dawson Cadillac Co.*, 62 Ill.App.3d 623, 20 Ill.Dec. 138, 379 N.E.2d 1206 (1st Dist. 1978). As plaintiffs' expert witness, Robert Hunter, pointed out, the danger inherent in a broker's failure to disclose is that the carriers offering the highest commissions, and ergo having the highest rates, will be selected.

*Did Bell Comply with His Obligations as a Fiduciary Under ERISA and as an Agent of the Insured Under the Common Law.*

In order to evaluate Bell's conduct under the standards outlined above, it is first necessary to explain what his contractual arrangements were with the insurance carriers and with the Funds. The Court will then address the question whether Bell disclosed his contractual arrangement with the insurer to the trustees. Finally, the Court will determine to what extent Bell charged unreasonable fees and thus profited from any breaches of duty established.

The Local 311 Pension and Health and Welfare Funds were established in 1966. In general, the arrangements made with Bell for the administration of these Funds paralleled those prevailing with respect to the Affiliated and Allied Funds. Leo Da-Lesio was the union trustee from the inception of the 311 Funds, and Robert Bray was the employer trustee for most of the period in issue.

Bell's contractual arrangement with the Funds was never reduced to writing. The evidence established, however, that it was contemplated that he would advise the trustees concerning the availability of various types of insurance coverage offered by different carriers. In addition, several of the trustees stated that part of his function was to negotiate with the insurer on behalf of the Funds. Bell also processed claims and determined the eligibility of claimants in accordance with the trust instruments and policies established by the trustees. Bell's administrative duties included maintenance of financial records, minutes of trustees' meetings, and records of employer contributions as well as assistance in the collection of delinquent contributions. In return for providing these services, Bell received a percentage of employer contributions. The Health and Welfare Fund paid 5% of employer contributions and the Pension Fund paid 6.9%. These figures were the result of computations made when Bell was retained initially. At that time, these percentages resulted in compensation to Bell that was slightly less than that which his predecessor

had earned. As the level of employer contributions increased, however, Bell's compensation increased accordingly.

Bell also was contractually obligated to the carriers to provide various services for which he was compensated. For example, the 1967 agreement between National Casualty and Alfred Bell, Inc. pertaining to the Local 311 Health and Welfare Fund's group accident and health insurance policy provides that Bell was to receive a commission of 4% of net premiums and an administration allowance of 4%. In return for this compensation, Bell was contractually obligated to remain broker of record, to service and cooperate in the case, and to comply with "reasonable rules and regulations of the Company." Similar restrictions applied to Bell's receipt of commissions from United Benefit Life Insurance Company on the policy issued to the Health and Welfare Fund. Under this contract, however, Bell was subject to the additional requirement that "[i]n event this risk becomes unprofitable to the Company and it appears practicable to the Company to attempt to conserve the business, it is agreed that the Broker will cooperate fully with the Company in the adjustment of rates, benefits, and all other procedures deemed necessary by the Company to place the risk on a profitable basis." In other words, Bell was obligated contractually to secure rate increases for the insurer at the same time he was supposed to be securing the most reasonably priced insurance for the insured. In return for his services to the insurer, Bell was entitled to 22% of premiums up to $5000 and declining percentages of additional increments. In subsequent years, he was to receive 5% of the first $1000 and declining percentages thereafter. With respect to the group annuity policy issued by United to the Local 311 Pension Fund, Bell earned both a commission and an administration fee. The commission ranged from 1.5% of the first $10,000 of deposits to lower percentages on additional amounts. The commission contract contained the same conditions as the accident and health policy issued by National Casualty. The special compensation allowance agreement, on the

other hand, was in "recognition of the . . Broker of Record performing the services of a qualified retirement plan consultant, such as designing the plan, preparing necessary Internal Revenue Service and Federal Disclosure Act filings, counseling the . . . policyholder and participants on various facets of the plan, and performing other special services as may be required." At trial, all of the trustees who testified indicated that they were under the impression that their agreement with Bell included compensation for these services. In any case, Bell received 3% of deposits for the first $10,000 and declining percentages thereafter in the first year. In subsequent years, Bell received 1% of the first $20,000 and smaller percentages of additional increments.

Bell had an even more advantageous relationship with Vision Care Services, Inc. which provided optometric services to the Funds. The agreement between Vision Care Services and Fund Administration, Inc., one of Bell's corporations, provides for a 6% administration fee and a 3% sales commission. The contract also provided for a $100 monthly retainer. Under its terms, the corporation was "retained to provide administrative and sales functions." In addition, neither Bell nor Fund Administration, Inc. was permitted to "represent any other group, association, or organization of any kind that furnishes vision care services in the jurisdiction of Vision Care Services." Under the contract, Bell and Fund Administration, Inc. were obligated to "furnish a sales organization to contact groups and individuals in an effort to sell the . . . program." The agreement also obligated Fund Administration "to provide a staff to furnish advice and consultation . . . concerning the operation, formulation, and other activities of a prepaid vision care program."

*Did Bell Disclose his Arrangements with the Insurers.*

At trial, Bell attempted to prove that he disclosed to the Funds the amount he was receiving as compensation from the carriers. In support of this contention, he testified that when he was first retained, he fully disclosed the fact that he was a broker and received commissions from the insurer. This testimony, however, was contradicted by that of almost all of the trustees who testified. However, given the massive epidemic of amnesia on the part of the individuals responsible for managing the various Funds, the truth is difficult to ascertain. Tom Bracken, the attorney for the Funds when Bell was initially retained, testified that he was aware that Bell was a broker, and stated that he was under the impression that commissions were set by state law. This testimony leads the Court to believe that although Bell might have disclosed the fact that he was a broker, the significance of that statement was not appreciated by the trustees. Moreover, it is clear that the details of Bell's compensation from the insurers were never discussed; in fact, the agreements between Bell and the insurers were apparently signed after Bell had been retained by the trustees. In any case, it is also apparent that the trustees did not engage in any inquiry to determine the existence and/or reasonableness of the compensation received by Bell from the insurer.

Bell's argument that he disclosed his status and compensation was also supported by evidence demonstrating that such information was attached to the financial disclosure forms filed yearly with the Department of Labor. These forms were prepared by the funds' accountant and were signed by the trustees. Apparently, though, none of the trustees on any of the Funds read these reports before signing them. In fact, the attorney for the Funds confessed that he did not read them but considered their approval to be a ministerial function. Again, the obliviousness of both the lay trustees and the professionals who served these Funds does not merit approval; nevertheless, the fact remains that by and large, the trustees did not become aware of the commissions and administrative allowances in this fashion. However, as will be discussed in a later part of this opinion, Robert Bray, the employer trustee on the Local 311 Funds, did become aware of Bell's duplicative billing practices during the mid–1970's

and attempted to remedy the situation. DaLesio, however, effectively thwarted these efforts.

 If the evidence discussed thus far pertaining to disclosure was all that the Court had to base its decision on, resolution of this critical issue would be quite problematic. The remainder of the evidence on this point, however, clearly tips the scale in favor of a finding of non–disclosure. First, there were a number of occasions on which Bell advised the trustees on matters to which his receipt of compensation from the insurers was relevant, but failed to bring such information to their attention. For example, on occasions when Bell supposedly solicited bids at the insistence of the trustees who were incensed over premium increases, Bell never advised them that he received a high level of compensation from the existing carrier and that he was contractually obligated to ensure the profitability of the account for that carrier. Such information would have enabled the trustees to evaluate Bell's contention that there were no carriers interested in bidding. This omission, coupled with Abato's testimony that Bell's comparisons of bids received were presented in an unusable form, leads the Court to conclude that Bell violated his duty to avoid the use of misleading comparisons or projections of costs. *See* National Association of Insurance Commissioners, Code of Ethical Practices, § 5 (1958). And, there were occasions on which the trustees questioned Bell concerning the amount of compensation he was receiving. Although he discussed the rise in his compensation from the Funds as a function of increases in the level of employer contributions, Bell evidently omitted any mention of the fact that his compensation from the carriers was increasing concomitantly. This was clearly a material omission, given the trustees' apparent concern with preserving the financial stability of the Funds. The most egregious failure to disclose, however, was Bell's lack of honesty with both the carriers and the trustees concerning the *nature* of his contractual obligations with the other party.

An examination of the contracts and correspondence between Bell and the carriers indicates that he was clearly acting on their behalf in securing the trustees' agreement to premium increases. In addition, Bell's testimony that he solicited bids on behalf of the trustees is compromised by correspondence demonstrating he was acting on behalf of these carriers in signing up the Funds for additional types of coverage. The testimony of the trustees is unequivocal with respect to their lack of knowledge of such dealings. The Court's finding that Bell failed to discharge his duty to disclose material information to the trustees, particularly with respect to his representation of parties with interests adverse to those of the Funds, is also supported by the fact that Bell failed to disclose certain material information to the carriers. In his deposition, Andrew Strachan testified that National Casualty was not aware of the fact that the trustees were paying Bell to perform the same administrative services as those for which he received compensation from the carrier. Also, Bell admitted he did not discuss his receipt of compensation from the funds with the insurers. In sum, Bell failed to disclose both the nature of his relationship with the carriers and the details of his financial relationship with them.

*The Reasonableness of the Fees Charged By Bell.*

 At trial, the plaintiffs also introduced evidence proving that Bell neither complied with proper procedures to ensure that the Funds obtained insurance at reasonable cost nor succeeded in obtaining such insurance at moderate expense. These failures constitute breaches of the requirements articulated in the exemption for broker commissions under ERISA as well as the common law duty to minimize costs in obtaining insurance on behalf of the Funds.

 Howard B. Clark, an expert in insurance regulation, testified that brokerage commissions are negotiable between the insured and the broker. Such negotiation, of course, depends on the broker complying with his duty to disclose his commissions. Clark also expressed disbelief of Bell's con-

tention that few companies were willing to submit bids when solicited. He stated that the health insurance area was characterized by intense price competition as there is no regulation of rates. He also testified that an insurance consultant should know which companies to approach in soliciting bids because this information is readily available in the Annual Report of the Superintendent of Insurance for the State of New York. Ideally, an insurance consultant should contact a number of brokers to get the best deal for his client, because a broker's duty to investigate alternative carriers is compromised by the receipt of commissions. Although Bell was a broker, he also held himself out to be a consultant in the area of insurance. The Court therefore finds that he had a duty either to omit his receipt of commissions from his analysis of alternative carriers, or to contact a variety of brokers to obtain the best possible coverage. The evidence established overwhelmingly that Bell did not comply with these requirements. Bell never produced the specifications which he allegedly sent to insurers to solicit bids; therefore, the Court cannot conclude that the amount of commissions he demanded was not included in those specifications. As Clark testified, if such commissions were specified, this would eliminate competition among carriers. The Court's conclusion that the specifications were not in conformance with proper standards is bolstered by Bell's admission that he would not have continued to serve as administrator and consultant if his compensation had been reduced.

The financial arrangements involving Bell were unreasonable in a number of respects. The National Association of Insurance Commissioners promulgated a Code of Ethical Practices in 1958 in response to perceived abuses. Bell testified that he was not familiar with this code and the Court finds his testimony in this regard to be entirely credible. First, § 2(B)(1) endorses the decremental commission scale principle which requires that the percentage of commissions decrease as the size of the total premium increases. The existence of significant economies of scale in administra-

tion of insurance policies justifies this principle. Bell's compensation, on the other hand, was a percentage of employer contributions. Therefore, his compensation from the Funds increased as employer contributions increased, despite the fact that there were no concomitant increases in the administrative burdens imposed on Bell. Thus, this principle was violated. Similarly, the NAIC code states that commissions should decrease after the first year because costs in the first year are higher than those in renewal years. Many of the contracts between Bell and the carriers do not incorporate this principle. The code also establishes reasonable rates of commissions for Funds of various sizes. These rates are well below those received by Bell. Commission payments to those acting in fiduciary capacities are prohibited. As the Court explained earlier, Bell should be considered a fiduciary for many purposes, so that his receipt of commissions is possibly unethical. While the code permits insurers to compensate brokers for the performance of certain services such as the maintenance of employee records, the processing of claims, and the billing of premiums, such payments must be limited to the "reasonable value" of the services rendered. Moreover, such work may be subcontracted only if such a system involves a cost savings over the insurer performing the services itself. An analogous requirement is incorporated in the brokerage commission exemption under ERISA. As Bell was receiving duplicate compensation for performing these services, it is highly improbable that he complied with this guideline. As will be discussed later, the evidence disclosed that the administrative costs borne by the Funds were in fact more than twice the average for Funds of similar geographic and constituent characteristics. Finally, § 4 bans improper inducements such as "lavish entertainment" whether paid "directly or indirectly." Clearly, Bell's provision to DaLesio of the beach condominium and the use of hotel suites violates this ethical principle.

There is ample additional evidence to support the Court's conclusion that Bell's fees

were far from reasonable. Robert Hunter, the expert witness on the costs of plans utilized the Cooper/Balanoff "Technical Report" published by the International Foundation of Employee Benefit Plans to analyze the administrative costs associated with the Affiliated and Local 311 Health and Welfare Funds for the year 1977. His analysis disclosed that the average expected cost for a welfare fund of the size of the Local 311 Fund, controlling for geographical location and the type of industry involved, was $33,000. The range of expected costs was $18,000 to $60,000. The actual cost incurred was $86,000 which was approximately 2.6 times the average expected cost, and $26,000 more than the maximum expected cost. These figures indicated that the Local 311 Health and Welfare Fund ranked in the 97th percentile in terms of cost. Defendants attempted to point out that this study did not take qualitative factors into account. The trustees who testified indicated that Bell performed the administrative portion of his tasks competently; however, there is certainly no evidence from which this Court could conclude that Bell's services were in any way extraordinary. Therefore, the Court finds that Hunter's testimony reliably demonstrates the unreasonableness of Bell's compensation.

Two other developments discussed at trial give additional support for the Court's conclusion. First, the termination of Bell resulted both in a reduction of premiums to reflect the savings to the insurer of not having to pay fees and commissions to Bell. Second, despite having to incur the extraordinary expenses of making a transition to a new administrator, Bell's successors performed the same services at significantly lower cost to the Funds. Also worthy of note is Bell's admission that when he was preparing a prospectus for the sale of his business, certain expenses were deemed unnecessary and therefore were excluded. Thus, it is apparent that Bell did not operate efficiently. Evidently, his receipt of excessive and duplicative compensation obviated the need to do so.

In sum, the Court has determined that Bell breached his duties under the common law and ERISA. The plaintiffs are entitled to restitution of the amount of undisclosed compensation received from the carriers. Therefore, the Court will order relief in the amount of $192,615 in favor of the Affiliated Health and Welfare Fund which absorbed the 311 Health and Welfare Fund after this lawsuit was filed. In addition, the Local 311 Pension Fund is entitled to $16,571.

*Is Bell Personally Liable for the Breaches of Fiduciary Duty.*

The plaintiffs concede that Alfred Bell, Inc. was created by Bell to administer the Local 311 plans. They contend, however, that the Court should pierce the corporate veil of this corporation and of Fund Administration, Inc. and hold Bell personally liable for the fiduciary breaches which occurred. An examination of the applicable law under ERISA and the common law indicates that the plaintiffs' position is correct. In the instant case, the evidence establishes that the corporate formalities were not observed. For example, many of the services performed for the Funds were provided by employees of Alfred M. Bell & Associates, Bell's sole proprietorship. Bell introduced no credible evidence showing that Alfred Bell, Inc. ever reimbursed the other firm for the value of those services. In addition, Robert Landsman, Bell's accountant, lacking clear recollection of certain events, did admit that after 1973, the corporate books were "zeroed out" every year and the income was treated as Bell's personal income for tax purposes. Many of the individuals who dealt with Bell indicated they were unaware of the existence of this corporation. Other evidence of significance includes the fact that some of the commissions were paid to Bell or his sole proprietorship rather than to the corporation and that when Bell sold his business to Weaver Associates, the agreement provided that payments were to be made to Bell, individually, rather than to the corporation.

■ Under ERISA, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . ." 29 U.S.C. § 1109(a). This provision indicates that there are two considerations relevant to a determination of the appropriate remedy. First, the interests of the participants and beneficiaries must be protected; any losses resulting from fiduciary breaches must be remedied. Second, the remedy must be designed to efficiently deter breaches. This goal is served by disgorgement of the fruits of the breach. In this case, it is clear that attainment of these goals demands subjection of Bell to personal liability for the fiduciary breaches found by this Court because it is evident that the profits earned by Bell's corporations inured to his benefit, thus rendering the corporations potentially judgment proof.

■ The Court's conclusion that Bell is personally liable for these fiduciary abuses is supported by other decisions under ERISA. *See, e. g., Marshall v. Carroll, supra,* 289 B.P.R. at D–10; and *Eaton v. D'Amato, supra,* 291 B.P.R. at D–14. In addition, a finding of personal liability with respect to the pre-ERISA breaches is also appropriate. At common law, piercing of the corporate veil is proper when the "alleged chief actor in the fraud is asserted to have dominated and controlled the intervening corporate entities, and through that domination and control, to have accomplished his personal ends and enterprises." *Crocker v. Pitti,* 179 Md. 52, 58, 16 A.2d 875, 877 (1940). In this case, Bell's manipulation of the corporate entities for his own personal profit, coupled with the resulting breaches of fiduciary duty, dictate that he be found personally liable for those breaches.

*Bell's Management of Funds Entrusted to Him by the Funds.*

At trial, the evidence established that Bell collected the premiums owed to Na-tional Casualty around the first of the month when they were due, but did not remit them to the company until the end of the month. In addition, the evidence establishes that the funds were not kept in a separate account but were commingled with the funds of Alfred Bell, Inc. Plaintiffs challenge this practice as a breach of fiduciary duty.

■ For a number of reasons, the Court has determined that this practice did not constitute a breach of any duty to the Funds. Initially, it should be noted that under 29 U.S.C. § 1144(b)(2)(A), ERISA does not preempt state regulation of insurance. *Wadsworth v. Whaland,* 562 F.2d 70, 75 (1st Cir. 1977), *cert. denied,* 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978). Plaintiffs' expert, Howard Clark, stated that the general rule is that the broker is the insurer's agent for the purpose of collecting premiums even if he is the insured's agent for the purpose of procuring insurance. This is the rule in Maryland. Under Md.Ann.Code Art. 48A, § 174, "[n]o insurance policy shall be subject to cancellation by the insurer for nonpayment of premiums in any situation where the premium due on such policy has been paid to the broker." Under these circumstances, the proposed duty to transmit the premiums promptly and to avoid commingling is owned to the insurer. *McFarling v. Demco, Inc.,* Okl., 546 P.2d 625 (1976); and *Bohlinger v. Zanger,* 306 N.Y. 228, 117 N.E.2d 338 (1954). Therefore, the plaintiffs are not entitled to recover on this claim.

Another claim pressed at trial related to Bell's alleged manipulation of the Affiliated Fund's checking account for his personal purposes. As these plaintiffs lack standing to raise claims pertaining to the Affiliated Fund, the Court need not address this issue.

*DaLesio's Liability as a Co-Fiduciary for Bell's Derelictions.*

■ Under the common law, a trustee's liability for the breaches of his cofiduciary was fairly limited. The *Restatement of Trusts (Second),* § 224 (1959) conditions a

finding of liability on a showing that the trustee "participate[d] in a breach of trust committed by his co–trustee; . . . improperly delegate[d] the administration of the trust to his co–trustee; . . . by his failure to exercise reasonable care in the administration of the trust has enabled his co–trustee to commit a breach of trust; or . . . neglect[ed] to take proper steps to compel his co–trustee to redress a breach of trust." In other words, there must be causation shown between the fiduciary's own breach of duty and the derelictions of his cofiduciary. A similar standard is imposed by ERISA in 29 U.S.C. § 1105(a) which states that "[i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary . . if he participates knowingly in, or, knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; . . . if by his failure to comply with section 1104(a)(1) . . . in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or . . if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." The legislative history indicates that liability for participation in, concealment of, or failure to remedy a breach by a cofiduciary is contingent upon a finding that the fiduciary knew that the other individual was a fiduciary, that the cofiduciary participated in the act constituting the breach, and that the act constituted a breach. In the alternative, the cofiduciary's breach must be shown to have resulted from the fiduciary's breach of one of the other duties specified in ERISA. Conference Report, *supra*, 1974 U.S.Code Cong. & Admin.News at 5080. *See generally*, Little and Thrailkill, *supra*, 30 Vand.L.Rev. at 32–34.

In pressing their claim that DaLesio should be held liable for all of Bell's derelictions, plaintiffs have emphasized DaLesio's active participation on the committee of trustees which investigated insurance consultants and selected Bell. In addition, they have introduced evidence showing that the compensation arrangement between the Funds and Bell was unreasonable because Bell's fees were tied to the level of employer contributions, rather than to his workload and because they violated the decremental principle discussed earlier. This evidence, while it might have been relevant to determining the liability of DaLesio or the other trustees for hiring Bell on these financial terms, is not determinative of DaLesio's liability for Bell's receipt of undisclosed commissions and fees from the carriers.

A more potent argument is that DaLesio failed to monitor Bell's compensation and performance in breach of his duty to exercise prudence in administering the Fund. In particular, the Court is deeply troubled by the failure of all of the trustees and of Fund counsel, to read the annual reports filed with the Department of Labor before signing them. On the other hand, DaLesio has argued that he reasonably relied upon the professionals serving the Funds to advise him concerning the nature of his duties and to bring information relevant to the discharge of those duties to his attention. Such reasonable reliance, if proven, would constitute a defense to liability on this claim. *Morrissey v. Curran, supra*, 483 F.2d at 485.

The Court does not approve of the generally cavalier fashion in which the trustees on all of the Funds approached their duties. Their apparent neglect of duty, however, pales in comparison to Bell's duplicitous conduct. The Court, therefore, might have been prepared to find no liability on DaLesio's part for Bell's breaches had the plaintiffs not introduced evidence showing DaLesio's receipt of substantial gratuities as well as his failure to take reasonable remedial steps once he knew about the duplicative compensation received by Bell.

In addition to the hotel suites and beach condominium discussed earlier, DaLesio apparently received gratuities of an entirely

different nature. On February 5, 1970, Alan Sturm, the Vice–President of National Casualty, wrote a letter to Bell which, on its face, indicated that the additional cost for benefits requested by the Affiliated trustees was $5.05 per month per insured. A cover memorandum, however, indicates that "[t]he attached letter is for 'display' purposes. The actual cost of these benefits is $2.58 per month per insured. The remainder of $2.47 constitutes the rate increase which is absolutely essential at this time." The memorandum proceeds to discuss the reason why such an increase was not charged earlier, and implicitly explains why the increase is being included as a hidden charge. "On October 1, 1968, we had to jump–because of Leo's pending election– from $24.00 per day to semi–private, for $1.30 a month. We have been in trouble ever since." In sum, Bell apparently manipulated the timing and disclosure of premium increases for DaLesio's political benefit.

■ The evidence discloses that DaLesio's receipt of gratuities did influence his conduct as a trustee. While the testimony of the witnesses was unanimous that DaLesio insisted that Bell provide high quality services, the record is curiously silent as to DaLesio's having scrutinized the costs of such services with similar zeal. Particularly probative, however, is the testimony of Robert Bray who served as the employer trustee on the 311 Pension and Health and Welfare Funds. Bray testified that in the early 1970's, Bell supposedly solicited bids at the trustees' insistence because the insurer was demanding a large premium increase. Bell reported that of the ten or twelve companies solicited, only two submitted bids. Bell also stated that the two bids received were at rates higher than those charged by the existing carrier. Bray came to question Bell's integrity upon realizing that the forms filed with the Department of Labor indicated that Bell was receiving compensation from the insurers which he never had disclosed. Bray reported this receipt of excessive compensation to DaLesio whose reaction was to threaten Bray verbally. Although DaLesio denied having any recollection of this conversation,

Bray's account is corroborated by Watson's testimony. Watson stated that during the mid-1970's, DaLesio told him that he had found out about the duplicative compensation. Bray testified that at this juncture he backed off from further confrontation because he anticipated that any motion to reduce Bell's fees would result in a deadlock and then would be referred to arbitration. Fearing that the dispute might not be resolved in favor of reducing Bell's fees should there be resort to arbitration, Bray sought other means of reducing administrative costs. He suggested to DaLesio, for example, that the plan switch to an employer–dominated plan which would cover a broader group of employees. DaLesio again protected Bell's interests by indicating that he would only assent to such a change if Bell was retained as the administrator. In light of DaLesio's resistance to any change that would endanger Bell's position, Bray proceeded to investigate alternatives. He compared notes with other attorneys in his firm, and discovered that contrary to Bell's contention that his fees were standard, other administrators charged more modest fees. When the trustees directed Bell to solicit bids again in 1975, Bray demanded that the proposals be put in writing and copies submitted to him so that he could solicit bids on his own. In addition, he insisted that a self–funding alternative be seriously considered. Rather than assist Bray in investigating alternative methods of operation, DaLesio stonewalled such efforts. After an argument with Bray about self–funding, DaLesio refused to meet with him again, thus forcing the employers to replace Bray. According to Bray, DaLesio also induced employers to replace Bray by causing delays in the processing of the claims of their employees. It is, of course, illegal for a union trustee to attempt to influence the employers' choice of trustee. *Associated Contractors v. Laborers*, 559 F.2d 222, 227 (3d Cir. 1977).

Despite having knowledge that Bell's fees were unreasonable in light of the duplicative compensation from the carrier, DaLesio failed to disclose this information to the

other concerned individuals or to take other remedial measures until 1977 after the grand jury had begun its investigation of Bell and DaLesio. Moreover, the Local 311 Health and Welfare Fund was, by this time, in serious financial straits which eventually necessitated the merger with the Affiliated Fund. The steps taken were clearly too little and too late. Therefore, the Court is justified in finding that DaLesio is jointly liable for the breaches of Bell, his cofiduciary.

Accordingly, it is this 19th day of August, 1980, by the United States District Court for the District of Maryland, ORDERED:

1. That an accounting be performed to determine the amount that would have been in the severance fund had the level of contributions remained at $200 per week for the duration of DaLesio's tenure as Secretary–Treasurer of Local 311. The remaining funds in the severance fund are to be returned to Local 311.

2. That DaLesio return $2,150, the amount of the automobile allowance received, to Joint Council 62.

3. That DaLesio reimburse Local 311 for the costs of the Baltimore Colts season football tickets in the amount of $3,354.70.

4. That DaLesio pay $1.00 to Local 311 as damages for his breach of fiduciary duty in negotiating the lease for the office space on Harford Road.

5. That DaLesio reimburse Local 311 for the value of the tax services received in the amount of $500.

6. That DaLesio pay $4,375 to the Local 311 Pension Fund as damages for his breach of fiduciary duty in using the beach condominium supplied by Bell.

7. That DaLesio pay $4,375 to the Affiliated Welfare Fund as damages for his breach of fiduciary duty to the Local 311 Health and Welfare Fund in using the beach condominium supplied by Bell. To the extent possible, the Affiliated Welfare Fund is directed to apply these funds to be benefit of those participants and beneficiaries who were associated formerly with the Local 311 Health and Welfare Fund.

8. That Bell and DaLesio pay $192,615 to the Affiliated Health and Welfare Fund for the benefit of former participants and beneficiaries of the Local 311 Health and Welfare Fund.

9. That Bell and DaLesio pay $16,571 to the Local 311 Pension Fund.

10. That judgment be entered in accordance with this ORDER.

11. That copies of this Memorandum and Order be sent to all counsel.